1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
8                            AT TACOMA
9

10   AARON O. HANSEN,

11                    Plaintiff,                     Case No.  C05-5518 RJB

12          v.

13   PIERCE COUNTY; PIERCE COUNTY               **ORDER GRANTING**
     SHERIFF'S DEPUTY JOSEPH KOLP, in his       **DEFENDANTS' MOTION**
14   individual capacity; PIERCE COUNTY         **FOR SUMMARY JUDGMENT**
     SHERIFF'S DEPUTY RUSSELL MARTIN,
15   in his individual capacity; THE CITY OF
     LAKEWOOD; THE CITY OF TACOMA;
16   TACOMA POLICE OFFICER
     CHRISTOPHER KARL, in his individual
17   capacity,

18                    Defendants.

19

20          This matter comes before the Court on Defendants' Motion for Summary Judgment.  Dkt. 24.

21   The Court has considered the pleadings filed in support of and in opposition to the motions and the file

22   herein.

23                  **PROCEDURAL AND FACTUAL HISTORY**

24          This dispute arises out of the incidents leading up to and immediately following the arrest of

25   Plaintiff Aaron Hansen.  Mr. Hansen alleges that his constitutional rights under the Fourth, Fifth and

26   Fourteenth Amendments were violated by the defendant officers due to unlawful search and seizure

27   and the use of excessive force.  Mr. Hansen has brought this action in federal court pursuant to 42

28   U.S.C. § 1983.

ORDER
Page - 1

1    On July 10, 2004, at approximately 1:00 A.M., Lakewood Officer Trent Stephens responded

2    to a call of armed robbery, and contacted the victim at the side of the road who was still talking with

3    the 911 operator on a cell phone. Dkt. 24 at 2. The victim told Officer Stephens that the suspect was

4    armed with a handgun, and had fled though a nearby field. *Id.* Officer Stephens set up a containment

5    at the far end of the field and waited for a K-9 unit to arrive. *Id.* At 1:01 A.M., Officer Russell

6    Martin arrived at the scene and spoke with the victim, who stated that his truck had been broken into

7    and that he had confronted one of the suspects who had a handgun. *Id.* The victim also stated that

8    there was a second suspect, but that he did not get a good look at him. *Id.* Shortly thereafter, Officer

9    Joseph Kolp arrived at the scene and spoke with Officer Martin and the victim, who also informed

10   Officer Kolp that the suspect was armed with a handgun. *Id.* Officer Christopher Karl arrived soon

11   after with a police dog, and picked up a scent at the far end of the field where the suspect was last

12   seen. *Id.* at 2-3. The dog track eventually led Officers Kolp, Martin and Karl to Mr. Hansen, who

13   was in a sleeping bag in the backyard of a nearby residence. *Id.*

14        According to Plaintiff's opposition brief, Mr. Hansen had attended a party earlier that evening

15   and had consumed a large quantity of alcohol. Dkt. 37 at 2. After returning from the party, Mr.

16   Hansen went into the backyard with a sleeping bag and pillow and fell asleep. *Id.* at 3. What

17   happened next is at the heart of this dispute. Mr. Hansen alleges that he was pulled from the sleeping

18   bag by the officers, and awoken when he was shocked with an electronic stun gun ("taser"). Dkt 1 at

19   4. Mr. Hansen further alleges that he was scared and stunned as two officers sat on him and took

20   turns "striking" and "shooting" him with the taser gun. *Id.* According to Mr. Hansen, this treatment

21   continued even though his arms were pinned down and he begged for mercy. *Id.* Mr. Hansen further

22   alleges that Officer Karl ordered his dog to attack him, ripping the flesh on his legs. *Id.* Mr. Hansen

23   testified that due to his intoxication, he did not realize what was happening until after he had been

24   handcuffed by the officers and pulled to his feet. *Id.* at 3; Dkt. 42 at 13. Mr. Hansen contends that he

25   believed, in his state of sleep and intoxication, that his children were teasing him. Dkt. 42 at 13-14.

26        In their Motion for Summary Judgment, the defendant law enforcement officers contend that

27   they yelled "come out of there" twice and "show your hands" three times before entering the yard

28   where Mr. Hansen was located. Dkt. 24 at 3. Officer Kolp then went behind the fence and yelled

ORDER
Page - 2

"show your hands" twice and "wake up" twice before attempting to pull Mr. Hansen from the sleeping bag and handcuff him. *Id.* Mr. Hansen then struggled with Officer Kolp, refusing to place his hands behind his back. *Id.* Mr. Hansen then pushed Officer Kolp with both hands, at which time Officer Martin tasered him. *Id.* The struggle continued for some time, until Officer Kolp requested help from Officer Karl, who released the dog in order to hold Mr. Hansen's legs. *Id.* The struggle continued for an additional period of time, until the officers succeeded in turning Mr. Hansen over and placing him in handcuffs. *Id.*

Unlike many cases involving allegations of excessive force, Mr. Hansen's ordeal was filmed in its entirety by the television show COPS, and a video tape has been submitted as evidence along with this Motion for Summary Judgment. Dkt. 36 (Exhibit G). The video tape is of high quality and shows the incidents leading up to Mr. Hansen's arrest, including (1) the initial interview with the robbery victim who clearly tells the officers that the suspect had a handgun and then describes the handgun, (2) part of the dog track that led to Mr. Hansen, (3) the three officers demanding that Mr. Hansen show his hands and come out of the sleeping bag, (4) Officer Kolp pulling the sleeping bag back and ordering Mr. Hansen to show his hands, (5) Mr. Hansen not responding other than to pull the sleeping bag back over his head, (6) Officer Kolp attempting to pull Mr. Hansen from the sleeping bag by his wrist, (7) Mr. Hansen clearly struggling with Officer Kolp, refusing to place his hands behind his back, (8) Mr. Hansen breaking free and apparently shoving Officer Kolp, (9) Officer Martin tasering Mr. Hansen for the first time, (10) Mr. Hansen struggling with Officers Kolp and Martin for approximately 30 seconds as they try to roll him over and place his hands behind his back, (11) Officer Kolp asking for assistance with Mr. Hansen's legs, which are kicking wildly and can be seen striking Officer Kolp several times, (12) Officer Karl releasing the dog that grabs Mr. Hansen by one leg, (13) an additional 30 seconds of Mr. Hansen struggling with the two officers and the dog, refusing to place his hands behind his back, and (14) the officers finally turning Mr. Hansen over and forcing his hands behind his back, at which time he is handcuffed. *Id.* at TCR 01:00:42:00-01:03:36:00. At no time can the officers be seen striking Mr. Hansen, or using any weapons other than a taser gun. At no time does Mr. Hansen appear to be begging for mercy. In contrast, Mr. Hansen appears to shove Officer Kolp with both hands before he is tasered. *Id.* at TCR 01:02:32:10. Throughout the entire scene, the

officers repeatedly yell warnings, including "give me your other hand, you're going to get tased, dude," prior to Mr. Hansen receiving an electric shock for the first time by Officer Martin. *Id.* at TCR 01:02:14:00-01:02:33:00.

On June 6, 2006, Defendants filed this Motion for Summary Judgment, requesting that the Court dismiss this action. Dkt. 24. In their motion, Defendants contend that (1) Plaintiff's constitutional rights were not violated, and there are no questions of fact surrounding this issue, (2) alternatively, the officers are entitled to qualified immunity, (3) Plaintiff's expert opinion does not create any Fourth Amendment jury issues, and (4) Pierce County and the Cities of Lakewood and Tacoma should be dismissed from this suit as a matter of law because Plaintiff has failed to state a cognizable constitutional claim against them. *Id.* at 6-22.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving

party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).  Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

## DISCUSSION

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1991), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).  The first element, acting under the color of state law, is clearly present in this case because the law enforcement officers were acting in their official capacity when they made the arrest.  The primary issue, therefore, is whether Plaintiff's constitutional rights were violated on the night in question.

## A.    SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF UNLAWFUL SEARCH AND SEIZURE

Defendants argue that the officers had probable cause to arrest Mr. Hansen, or at least reasonable suspicion to make an investigatory stop, and that therefore his Fourth Amendment right to remain free from unlawful search and seizure was not violated.  The United States Supreme Court has drawn a bright line rule on the issue of probable cause.  "The standard of probable cause applies to all arrests, without the need to balance the interests and circumstances involved in particular situations." *Dunaway v. New York*, 442 U.S. 200, 208 (1979).  There is no Fourth Amendment violation when an individual is arrested on probable cause but it is the wrong person.  *Hill v. California*, 401 U.S. 797 (1971).

Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant

1    had committed a crime.  *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992) (quoting *United*

2    *States v. Potter*, 895 F.2d 1231, 1233-34 (9th Cir. 1990)).  Police officers may rely on the totality of

3    facts available to them when determining whether probable cause exists to make an arrest.  *United*

4    *States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005).  Law enforcement officers may draw

5    upon their experience and expertise in determining the existence of probable cause.  *United States v.*

6    *Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989), *overruled on other grounds by United States v. Ruiz*,

7    257 F.3d 1030 (9th Cir. 2001).

8            On the other hand, police may make an investigative stop even though they lack probable

9    cause providing they have reasonable suspicion to justify the initial inquiry.  *Terry v. Ohio*, 392 U.S. 1,

10   20 (1968).  Police have the right to use some degree of physical coercion or threat thereof to effect an

11   investigative stop.  *McKinney v. City of Tukwila*, 103 Wn. App. 391, 402 (2000) citing *Graham v.*

12   *Connor*, 490 U.S. 386, 396-97 (1989).  Moreover, various courts have recognized the lawfulness of

13   law enforcement officers securing subjects in potentially dangerous situations.  Officers are

14   "authorized to take such steps as were reasonably necessary to protect their personal safety and to

15   maintain the status quo during the course of the stop."  *United States v. Hensley*, 469 U.S. 221, 235

16   (1985) (finding that an officer approaching an individual with his service revolver drawn and pointed

17   into the air was well within the permissible range of a Terry stop where the individual was wanted for

18   investigation due to possible involvement in an armed robbery and was reported to be armed and

19   dangerous); *State v. Belieu*, 112 Wn.2d 587, 605 (1989) (finding that officers' use of drawn guns was

20   permissible in an investigatory stop where the officers reasonably feared for their safety); *United*

21   *Stated v. Taylor*, 716 F.2d 701, 707-09 (9th Cir. 1983) (finding that an officer's actions in approaching

22   a suspect with gun drawn and pointed at the suspect, ordering the suspect to the ground, and

23   handcuffing and frisking the suspect was within the bounds of a Terry stop where the officers had a

24   valid reason to fear for their safety).

25           In *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995), the court

26   discussed a similar case involving armed robbery suspects that were handcuffed during an

27   investigatory stop:

28           Handcuffing [defendants] also was not necessarily unlawful under clearly established
             law.  In *United States v. Bautista*, 684 F.2d 1286, 1288-89 (9th Cir. 1982), we found

that handcuffing a suspect does not automatically turn a lawful investigative stop into a de facto arrest.  Noting that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical Terry stop," we nevertheless found that use of handcuffs under the circumstances in that case did not convert the stop to an arrest.  *Id.* at 1289.  The detainees in that case were suspected of armed robbery, and use of the handcuffs was reasonable because it "eliminated the possibility of an assault or escape attempt during the questioning."  *Id.* at 1290.

In the instant case, the Court does not need to determine whether probable cause existed to arrest Mr. Hansen when he was initially contacted by the officers, but rather, whether the officers had reasonable suspicion to make an investigative stop, and whether the officers' initial attempt to forcibly handcuff Mr. Hansen was within the bounds of the investigative stop.  Because a video tape exists of the entire incident and the record is fully developed, no questions of fact remain and these issues can be easily determined by the Court as a matter of law.

First, when considering the events leading up to the officers' initial encounter with Mr. Hansen, it is clear that the officers had a reasonable suspicion to stop and investigate Mr. Hansen.  All three of the officers believed that an armed robbery had just occurred, and that the suspect was still armed, dangerous, and on the run in the immediate neighborhood.  The victim not only told the officers that the suspect was armed with a handgun, but provided a description of the handgun and the direction in which the suspect fled.  Moreover, the dog track led the three officers to Mr. Hansen, who appeared to be hiding in a backyard under a blanket at 1 A.M.  Under the circumstances, it is clear that any reasonable law enforcement officer would have had reasonable suspicion to stop and investigate Mr. Hansen.

Second, it is also clear that the officers' initial attempt to handcuff Mr. Hansen was within the bounds of an investigatory stop, because they reasonably feared for their safety under the circumstances.  As previously noted, while the officers were pursuing an armed suspect, they followed a dog track to Mr. Hansen who appeared to be hiding in a backyard under a sleeping bag at 1:00 A.M.  The officers could not see Mr. Hansen's hands or person because of the sleeping bag, and Mr. Hansen failed to respond to their commands to show his hands and come out.  When Officer Kolp pulled the sleeping bag back and ordered Mr. Hansen to show his hands, Mr. Hansen failed to comply and pulled the bag back over his head.  Under these circumstances, any reasonable officer would fear that this suspect posed a serious risk to himself and his fellow officers.  For example, the handgun could have

1   been on the suspect's person or within easy reach inside the sleeping bag, and the suspect may have

2   been in a position to shoot one of more of the officers at any time.  It was therefore not unreasonable

3   to attempt to handcuff Mr. Hansen in order to continue with the investigatory stop.

4         Moreover, the record shows that as soon as Mr. Hansen resisted being handcuffed, appeared

5   to shove Officer Kolp, and forcibly struggled with Officers Kolp and Martin, probable cause existed to

6   arrest him for obstruction of justice, resisting arrest, and assault in the third degree.  *See* RCW

7   9A.76.020; RCW 9A.76.040; RCW 9A.36.031(g).  A person can be arrested for obstruction of justice

8   is he or she "willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his

9   or her official powers or duties."  *See* RCW 9A.76.020.  Merely refusing to answer an officer's

10  questions by itself is not obstruction.  *State v. Contreras*, 92 Wn. App. 307, 316 (1998).  But flight,

11  physical resistance, refusal to obey an officer's order to return to a car, fleeing, or providing false

12  information provide a basis for an arrest for obstruction of justice.  *Id.* at 316-17.  Resisting arrest is

13  defined as a person who "intentionally prevents or attempts to prevent a peace officer from lawfully

14  arresting him."  *See* RCW 9A.76.040.  Assault in the third degree is defined as:

15        (1) assault by actual battery; (2) assault by attempting to inflict bodily injury on another
          while having apparent present ability to inflict such injury; and (3) assault by placing the
16        victim in reasonable apprehension of bodily harm.

17  *See* RCW 9A.36.031(g).

18        The video tape is very clear on this point.  After Officer Kolp ordered Mr. Hansen several

19  times to show his hands and Mr. Hansen did not comply, Officer Kolp attempted to force Mr.

20  Hansen's hands behind his back so that he could be handcuffed.  Dkt. 36 (Exhibit G) at TCR

21  01:02:22:00.  Immediately thereafter, Mr. Hansen clearly struggled with Officer Kolp, refused to

22  allow his hands to be moved behind his back, broke free, and shoved Officer Kolp with both hands.

23  TCR 01:02:32:10.  Because Officer Kolp's attempt to handcuff Mr. Hansen was reasonably within the

24  bounds of an investigatory stop, and because Mr. Hansen physically resisted being handcuffed, broke

25  free, and shoved Officer Kolp, probable cause then existed to arrest Mr. Hansen for obstruction of

26  justice, resisting arrest, and/or assault in the third degree.  Probable cause exists when, under the

27  totality of the circumstances known to the arresting officers, a prudent person would have concluded

28  that there was a fair probability that the defendant had committed a crime.  *United States v. Garza*,

1    980 F.2d 546, 550 (9th Cir. 1992) (quoting *United States v. Potter*, 895 F.2d 1231, 1233-34 (9th Cir.

2    1990)). "An officer who observes criminal conduct may arrest the offender without a warrant, even if

3    the pertinent offense carries only a minor penalty." *Tatum v. City of San Francisco*, 441 F.3d 1090,

4    1094 (9th Cir. 2006) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). If the facts

5    known to an arresting officer are sufficient to create probable cause, the arrest is lawful, regardless of

6    the officer's subjective reasons for it. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). In the

7    instant case, because Mr. Hansen clearly used physical force to resist being handcuffed, and because

8    he shoved Officer Kolp with both hands in the process, a prudent person in the officers' position

9    would have concluded that there was a fair probability that Mr. Hansen had committed one of more of

10    the above crimes, and that probable cause existed to arrest Mr. Hansen.

11       The Court therefore finds as a matter of law that the officers had reasonable suspicion to make

12    an investigatory stop when initially contacting Mr. Hansen, and that the officers' choice to draw their

13    weapons and attempt to handcuff Mr. Hansen was within the bounds of the investigatory stop because

14    the officers reasonably feared for their safety. Moreover, the Court finds as a matter of law that once

15    Mr. Hansen used physical force to resist being handcuffed, and apparently shoved Officer Kolp,

16    probable cause existed to arrest Mr. Hansen. On a separate note, while the issue of unreasonable

17    search itself has not been briefed or argued by either party, Mr. Hansen's Complaint does allege

18    "unreasonable search and seizure." Under the totality of the circumstances in this case, the Court also

19    finds that it was reasonable under the circumstances for the officers to enter through the fence to

20    conduct the investigatory stop, once they had ordered Mr. Hansen to come out and show his hands

21    and he failed to comply with their orders. Therefore, Mr. Hansen's Fourth Amendment rights to

22    remain free from unlawful search and seizure were not violated, and this claim should be dismissed

23    with prejudice.

24   **B.**    **QUALIFIED IMMUNITY AND PLAINTIFF'S CLAIM OF EXCESSIVE FORCE**

25       Plaintiff alleges that the force used against him during his arrest was excessive and violated his

26    Fourth Amendment rights. Defendants in turn argue that qualified immunity protects them against

27    Plaintiff's excessive force claim. Qualified immunity is an "entitlement not to stand trial or face the

28    other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*,

1    472 U.S. 511, 526 (1985). Defendants in a section 1983 action are entitled to qualified immunity

2    from damages for civil liability if their conduct does not violate clearly established statutory or

3    constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S.

4    800, 818 (1982). The existence of qualified immunity generally turns on the objective reasonableness

5    of the actions, without regard to the knowledge or subjective intent of the particular officer. *Id.* at

6    819. "Qualified immunity shields an officer from suit when she makes a decision that, even if

7    constitutionally deficient, reasonably misapprehends the law governing the circumstances she

8    confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier*, 533 U.S. at 206).

9    "Qualified immunity operates to protect officers from the sometimes hazy border between excessive

10   and acceptable force." *Brosseau*, 543 U.S. at 194 (quoting *Saucier*, 533 U.S. at 206). Whether a

11   reasonable officer could have believed his or her conduct was proper is a question of law for the court

12   and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*,

13   988 F.2d 868, 872-73 (9th Cir. 1993).

14        In analyzing a qualified immunity defense, the Court must determine: (1) whether a

15   constitutional right would have been violated on the facts alleged, taken in the light most favorable to

16   the party asserting the injury; and (2) whether the right was clearly established when viewed in the

17   specific context of the case. *Saucier*, 533 U.S. at 201. "The relevant dispositive inquiry in

18   determining whether a right is clearly established is whether it would be clear to a reasonable officer

19   that his conduct was unlawful in the situation he confronted." *Id.* "The contours of the right must be

20   sufficiently clear that a reasonable official would understand that what he is doing violates that right."

21   *Brosseau*, 543 U.S. at 199 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The privilege

22   of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute

23   immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Saucier*, 533 U.S. at

24   201.

25   **I.  Constitutional Right Allegedly Violated**

26        The first inquiry under *Saucier v. Katz* is whether the facts as alleged constitute a civil rights

27   violation. The Fourth Amendment's reasonableness standard governs section 1983 claims for

28   excessive force. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Smith v. City of Hemet*, 394 F.3d

689, 700 (9th Cir. 2005).  Determining whether force is reasonable under the Fourth Amendment requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests." *Graham*, 490 U.S. at 396 (internal quotations omitted).  The court must gauge the reasonableness of the force from the perspective of the officer on the scene rather than with 20/20 hindsight.  *Id.*  The relevant factors used in determining the reasonableness of force include the nature of the crime involved, the threat the suspect posed, and whether the suspect was resisting arrest.  *Id.*  The reasonableness inquiry in an excessive force case is an objective one based upon the totality of the circumstances.  *Draper v. Reynolds*, 369 F.3d 1270, 1277 (2004).  The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  *Graham*, 490 U.S. at 397.

It is well established that excessive force claims are evaluated for objective reasonableness based upon the information the officer had when the conduct occurred.  *Saucier v. Katz*, 533 U.S. 194, 207 (2001).  "Because police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a peculiar situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."  *Id.* at 205 (quoting *Graham*, 490 U.S. at 397).  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force that in fact was needed."  *Saucier*, 533 U.S. at 205.

According to Plaintiff's opposition brief, Mr. Hansen was sleeping off the effects of eight alcoholic drinks in a sleeping bag in his friend's backyard when he was pulled from the bag and awakened by repeated shocks from a taser gun.  Dkt 1 at 4.  Mr. Hansen further alleges that he was scared and stunned as both officers sat on him and took turns "striking" and "shooting" him with the taser gun.  *Id.*  According to Mr. Hansen, this treatment continued even though his arms were pinned down and he begged for mercy.  *Id.*  Mr. Hansen further alleges that Officer Karl ordered his dog to attack him, ripping the flesh on his legs.  *Id.*  Mr. Hansen also testified that due to his intoxication, he did not realize what was happening until after he had been handcuffed by the officers and pulled to his

1   feet, and that the officers should have known that he was intoxicated and not a threat to their safety.

2   *Id.* at 3; Dkt. 42 at 13.  While the facts alleged by Mr. Hansen are not entirely supported by the video

3   tape submitted as evidence in this case, the applicable standard at this stage in the qualified immunity

4   analysis is whether a constitutional right would have been violated on the facts alleged, taken in the

5   light most favorable to the party asserting the claim.  When accepted as true, Mr. Hansen's allegations

6   of excessive force provide a basis for a constitutional claim under the Fourth Amendment.

7   **II.  Clearly Established Constitutional Right**

8          The second prong of the qualified immunity inquiry turns on whether the right allegedly

9   violated, in this case the right to remain free from excessive force, was clearly established at the time

10  of the incident in question.  *Graham*, 490 U.S. at 396.  Plaintiff bears the burden of showing that the

11  right in question was clearly established at the time of the incident.  *Romero v. Kitsap County*, 931

12  F.2d 624, 627 (9th Cir. 1991).  Moreover, the right must be clearly established in the context of the

13  circumstances faced by the officers.  *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1988).

14  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary

15  judgment based on qualified immunity is appropriate."  *Saucier*, 503 U.S. at 202.  Qualified immunity

16  protects all but the plainly incompetent or those who knowingly violate the law.  *Malley v. Briggs*,

17  475 U.S. 335, 341 (1986).

18         The contours of the right in question must be sufficiently clear that a reasonable official would

19  understand that what he is doing violates that right.  *Saucier*, 503 U.S. at 202.  The relevant,

20  dispositive inquiry in determining whether a right is clearly established is whether it would be clear to

21  a reasonable officer that his conduct was unlawful in the situation he confronted.  *Id.* (citing *Wilson v.*

22  *Layne*, 526 U.S. 603, 615 (1999)).

23         In the instant case, the question before the Court is whether it would have been clear to a

24  reasonable officer in the position of Officers Kolp, Martin and Karl that the force used against Mr.

25  Hansen violated his Fourth Amendment rights.  If not, the force used would not be "excessive" for

26  constitutional purposes.

27         In *Saucier v. Katz*, the United States Supreme Court set forth some of the standards to be used

28  in this analysis:

The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

503 U.S. at 205.

Excessive force claims that arise in the context of an arrest or investigatory stop of a free citizen are analyzed under the Fourth Amendment reasonableness standard. *Graham*, 490 at 394-95. The reasonableness of a defendant's actions depends on factors such as (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* The totality of the circumstances of each case must be considered. *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995).

*Severity of the crime at issue.* The record clearly shows that all three officers in this case reasonably believed that an armed robbery had just occurred, and that the suspect was still armed, dangerous, and on the run in the immediate neighborhood. The victim not only informed the police that the suspect was armed, but described the handgun as black. The victim also informed the police that the suspect had an accomplice. Pursuing an armed suspect through darkened streets in the middle of the night is one of the most dangerous responsibilities that society demands of law enforcement officers. Officers do not know whether such a suspect will yield to their authority, or attempt to kill them on sight. When an armed robbery occurs with a handgun, the suspect has already shown that he or she is willing to use the threat of extreme force to violate the rights of others, and it is highly reasonable for an officer to assume that such a suspect is an extreme danger to the officers and other members of the community.

*Whether the suspect posed an immediate threat to the safety of the officers or others.* As previously noted, while the officers were pursuing an armed suspect, they followed a reasonably-fresh dog track to Mr. Hansen who appeared to be hiding in a backyard under a sleeping bag at 1:00 A.M. The officers could not see Mr. Hansen's hands or person because of the sleeping bag, and Mr. Hansen failed to respond to their commands to show his hands and come out. When Officer Kolp pulled the

ORDER
Page - 13

1   sleeping bag back and ordered Mr. Hansen to show his hands, Mr. Hansen failed to comply and pulled

2   the bag back over his head.  Under these circumstances, any reasonable officer would fear that this

3   suspect posed a serious risk to himself, his fellow officers, and members of the community.  For

4   example, the handgun could have been on the suspect's person or within easy reach inside the sleeping

5   bag, and the suspect may have been in a position to shoot one of more of the officers at any time.

6   Moreover, the environment in which Mr. Hansen was located was dark with tall grass, and a handgun

7   could have been easily concealed a few feet away in the grass.  The victim had also reported that the

8   armed robbery suspect had an accomplice.

9        The record also clearly shows that within the 45 seconds between the officers' initial contact

10   with Mr. Hansen, and Officer Kolp's first attempt to handcuff Mr. Hansen, the three officers shone

11   their flashlights on Mr. Hansen, pointed their guns at Mr. Hansen, and shouted the following

12   commands:

13        Right there.
          Come out of there.
14        Show your hands.
          Show your hands.
15        Russ, hold him at gunpoint, I'm going to cross over [the fence].
          Bypass him, I've got an open fence right here, I'm going in.
16        Wake up [shining flashlight in face].
          Wake up.
17        Show me your hands.

18   Dkt. 36 (Exhibit G) at TCR 01:01:27:00-01:02:14:00.  At no time does Mr. Hansen appear to

19   respond to the officers' commands, other than to pull the sleeping bag back over his head.  *Id.*  Mr.

20   Hansen argues that the officers should have known that he was intoxicated and therefore not a threat.

21   The standard that applies at this stage of our analysis, however, is whether a reasonable officer in the

22   position of Officers Kolp, Martin and Karl would have believed that Mr. Hansen posed an immediate

23   threat to the safety of the officers or others.  Mr. Hansen's failure to respond to the officers' orders

24   would not be construed by a reasonable officer under these circumstances to mean that Mr. Hansen

25   was intoxicated, but rather that Mr. Hansen was ignoring their orders.  The fact that Mr. Hansen

26   pulled the sleeping bag back over his head only further supports this conclusion, because Mr. Hansen

27   was clearly moving and active, and completely out of sight of the officers who suspected him to be

28   armed with a handgun.  A reasonably prudent officer under the circumstances could have reasonable

1    concluded that Mr. Hansen was reaching for a handgun, and responded by using force to pull him out

2    of the bag and handcuff him.

3           *Whether the suspect is actively resisting arrest.*  The record is very clear on this point.  As

4    soon as Mr. Hansen pulled the sleeping bag back over his head, Officer Kolp reached into the bag,

5    grabbed Mr. Hansen's wrist in a wrist-hold, and attempted to pull him out.  When that failed, Officer

6    Kolp attempted to roll Mr. Hansen over and place his hands on his back in order to handcuff him.  The

7    video clearly shows Mr. Hansen struggling to prevent his hands from being placed behind his back.  At

8    this time, Officer Kolp yells at Mr. Hansen, "Give me your other hand dude, give me your other hand.

9    You're going to get tased, dude."  Mr. Hansen continues to struggle with Officer Kolp, breaks free,

10   rolls over, and apparently shoves Officer Kolp with both hands.  *Id.* at TCR 01:02:32:10.  Officer

11   Martin then shocks Mr. Hansen with a taser gun.  *Id.* at TCR 01:02:33:00.

12          The next 23 seconds of the video clearly shows Mr. Hansen physically resisting Officers Kolp

13   and Martin as they attempt to roll him over and place his hands behind his back.  Officer Martin

14   appears to shock Mr. Hansen at least six times, though the number of shocks is not easy to determine

15   from the video.  At no time can the officers be seen striking Mr. Hansen, and at no time does it appear

16   that Mr. Hansen stopped resisting the officers.  At one point, Mr. Hansen began kicking his feet,

17   which appear to be striking one of the officers.  Officer Kolp then shouted "I need help, get his feet."

18   *Id.* at TCR 01:02:56:20.  Officer Karl then released the police dog that grabbed Mr. Hansen's leg by

19   the ankle.  *Id.* at TCR 01:03:03:00.  Officer Karl shouted "Lay on the ground.  Put your hands behind

20   your back.  Put your hands behind your back.  Do it now.  Do it now."  *Id.* at 01:03:05:00.  For

21   another 25 to 30 seconds, Officers Kolp and Martin continued to attempt to roll Mr. Hansen over and

22   place his hands behind his back.  The officers eventually succeeded in turning him over and placing

23   him in handcuffs.  *Id.* at 01:03:36:00.

24          In his opposition brief to this Motion for Summary Judgment, Mr. Hansen does not directly

25   deny resisting the officers, but rather provides a short paragraph in support of his excessive force

26   claim.  Dkt. 37 at 17.  In this paragraph, Mr. Hansen states that he was obviously not a threat to the

27   officers because he was obviously unconscious, and states that they tasered him several times,

28   unleashed the dog on him, and caused him injuries.  *Id.*  The standard at this point of the Court's

ORDER
Page - 15

1    analysis, however, is whether a reasonable officer in the position of Officers Kolp, Martin, and Karl

2    would have reasonably believed that Mr. Hansen was resisting arrest.  Based on the overwhelming

3    evidence on the record, the Court finds that a reasonable officer in this situation would have

4    reasonably believed that Mr. Hansen was resisting arrest.

5            Tying all of these issues together, the Court must finally decide whether it would have been

6    clear to a reasonable officer in the position of Officers Kolp, Martin and Karl that the force used

7    against Mr. Hansen violated his Fourth Amendment rights.  The record shows that the force used

8    against Mr. Hansen included a wrist hold, physical attempts to force his arms behind his back,

9    wrestling, several taser shocks, and the use of a police dog to hold Mr. Hansen's leg.  While Mr.

10   Hansen might not have been a threat to the officers that night, since no gun was found and he was

11   never convicted of armed robbery, the Court cannot rely on this argument to make its determination.

12   Nor does the Court have to determine whether the use of the taser and the dog were absolutely

13   necessary or the least intrusive means under the circumstances.  Rather, the Court must determine

14   whether it would be clear to a reasonable officer–knowing what the officers knew at the time–that

15   such force violated Mr. Hansen's rights.  As noted in *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.

16   1994):

17          Requiring officers to find and choose the least intrusive alternative would require them
            to exercise superhuman judgment. ... Imposing such a requirement would inevitably
18          induce tentativeness by officers, and thus deter police from protecting the public and
            themselves.  It would also entangle the courts in endless second-guessing of police
19          decisions made under stress and subject to the exigencies of the moment. ... Officers
            thus need not avail themselves of the least intrusive means of responding to an exigent
20          situation; they need only act within that range of conduct we identify as reasonable.

21           Based on the totality of the circumstances in this case, it would not have been clear to a

22   reasonable officer that the force used against Mr. Hansen was excessive and violated his Fourth

23   Amendment rights.  Moreover, Mr. Hansen has offered no authority to suggest that the law has placed

24   the officers on notice that their conduct was clearly unlawful.  Because police officers are forced to

25   make split-second judgments about the amount of force that is necessary in a particular situation, in

26   circumstances that are tense, uncertain, and rapidly evolving, the reasonableness of an officer's belief

27   as to the appropriate level of force should be judged from that on-scene perspective.  *Saucier*, 533

28   U.S. at 205.  A reasonable officer would not have known that Mr. Hansen was intoxicated, known

1  that he was unarmed, known that he was not the armed suspect they were pursuing, known that Mr.

2  Hansen was not a threat, and–most importantly–known that the force used in this case was clearly

3  unlawful and violated Mr. Hansen's rights.  Therefore, Officers Kolp, Martin and Karl are entitled to

4  qualified immunity on Mr. Hansen's claim of excessive force.

5  **C.   PLAINTIFF'S EXPERT OPINION DOES NOT CREATE ANY FOURTH
        AMENDMENT JURY ISSUES**

6          In their Motion for Summary Judgment, Defendants contend that Plaintiff's expert opinion,

7  authored by Frank Connelly, does not create any Fourth Amendment jury issues.  In his response brief,

8  Plaintiff fails to respond to this issue.  The Court has carefully reviewed the record, including

9  Plaintiff's expert witness opinion, and agrees that the expert opinion does not raise any Fourth

10 Amendment jury issues.  Plaintiff's expert contends that (1) the officers failed to investigate properly

11 and did not have the knowledge to determine whether probable cause existed to arrest Mr. Hansen,

12 (2) the officers did not act reasonably when they failed to identify themselves as police[1], (3) Officer

13 Karl did not act reasonably when releasing the dog, (4) the officers unreasonably booked Mr. Hansen

14 for felony assault, (5) the officers acted unreasonably when they failed to note the presence of the

15 COPS video team on their police report, (6) the officers unreasonably booked Mr. Hansen for

16 robbery, and (7) the officers' errors and omissions caused Mr. Hansen unnecessary pain and injury,

17 including jail time.

18          Several of these issues raised by Mr. Connelly do not constitute a violation of Mr Hansen's

19 Fourth Amendment rights, while others are irrelevant to the issues at hand.  Moreover, Mr. Connelly's

20 conclusions are not relevant to the Court's independent determination of qualified immunity based on

21 the record.   It is the Court's responsibility, based upon review of the record, to determine whether it

22 would have been clear to a reasonable officer in the position of Officers Kolp, Martin and Karl

23 whether the conduct was unlawful under the circumstances.  *Bagley*, 988 F.2d at 871.  Mr. Connelly's

24 opinions, however, have been considered with regard to the Court's summary judgement analysis on

25 the Fourth Amendment claims of unlawful search and seizure, but found unhelpful because the Court

26 has applied the standards of reasonable suspicion for an investigatory stop, rather than the standards

27

28

_____

[1]The record shows that the officers were wearing police uniforms when they contacted Mr. Hansen.

of probable cause for an arrest.

**D.    SUMMARY JUDGMENT FOR PIERCE COUNTY AND THE CITIES OF LAKEWOOD AND TACOMA**

In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted through an official custom, pattern or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity ratified the unlawful conduct. *Monnell v. Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991).

Plaintiff's theory of liability against the above municipalities is unclear from his Complaint and opposition brief, though appears to be based on the agencies' alleged failure to properly investigate this incident, thereby ratifying the officers' alleged unlawful conduct.

In order to establish municipal liability, a plaintiff must demonstrate a direct causal link between a municipal action and the deprivation of federal rights. *Bryan County v. Brown*, 520 U.S. 397 (1997). If there is no constitutional violation, a necessary element of municipal liability is lost. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Plaintiffs have failed to argue or provide evidence that a sanctioned policy was directly linked to a constitutional violation, and failed to advanced any cogent theory or argument that would result in liability against any of the above government agencies. Defendants have shown in their Motion for Summary Judgment that there is no issue of material fact regarding the claims against these agencies, and Defendants are entitled to judgment as a matter of law. Defendants' Motion for Summary Judgment should therefore be granted on this issue.

1

**ORDER**

2
    Therefore, it is hereby

3
    **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 24) is **GRANTED**.  This

4
case is **DISMISSED WITH PREJUDICE**.

5
    The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of

6
record and to any party appearing *pro se* at said party's last known address.

7
    DATED this 28th day of July, 2006.

8

9

10
                             Robert J. Bryan

11
                             United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 19